**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

Cathy Chevalier,
as survivor of Robert Kaelin, deceased,
on behalf of K.K.,

         Plaintiff,

    -against-

Martin O'Malley, Commissioner of Social
Security Administration,[1]

         Defendant,

Social Security Administration,

         Interested Party.

----------------------------------------------------------------X

7:23-cv-2701-NSR-VR

**REPORT &**
**RECOMMENDATION**

**TO THE HONORABLE NELSON STEPHEN ROMÁN, United States District Judge:**

  Plaintiff Cathy Chevalier, as survivor of Robert Kaelin (deceased), on behalf of K.K., a

minor, brings this action under 42 U.S.C. § 405(g). She seeks judicial review of a final

determination of the Commissioner of Social Security (the Commissioner), which denied

Kaelin's application for disability benefits under the Social Security Act, and found that he was

not disabled. This action is before the undersigned under an Order of Reference entered on April

5, 2023.[2] (ECF No. 6 (Or. of Ref.)).

  Chevalier now moves "for an Order remanding this case for calculation of benefits only."

(ECF Nos. 12 (Mot.), 13 (Mem.)). By brief, the Commissioner opposes Chevalier's motion and

requests that the Court affirm the Commissioner's decision. (ECF No. 14 (Br.)). For the reasons

---

[1] Martin O'Malley became the Commissioner on December 20, 2023. He is substituted for the former Acting
Commissioner, Kilolo Kijakazi, under Rule 25(d) of the Federal Rules of Civil Procedure. The Clerk of Court is
respectfully directed to amend the official caption to conform to the above.
[2] This action was reassigned to the undersigned on June 6, 2023. (ECF 06/06/2023 Notice of Reassignment).

below, I respectfully recommend that Chevalier's motion be **DENIED**, and that the Commissioner's request to affirm be **GRANTED**.

## I.   BACKGROUND

The facts below are taken from the administrative record of the Social Security Administration, filed by the Commissioner on July 3, 2023.  (ECF Nos. 11 to 11-5 (SSA Record)).[3]

### A.   Application History

On September 8, 2020,[4] Kaelin applied for disability benefits under the Social Security Act and Supplemental Security Income, alleging that he had been disabled since October 9, 2018.  (ECF No. 11 at 233–34).[5]  Kaelin's claims were initially administratively denied on May 13, 2021 (*id.* at 80–100, 133–39), and then again after reconsideration on July 9, 2021 (*id.* at 101–23, 142–55).  On August 3, 2021, Kaelin requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 156–58).  On February 25, 2022, ALJ Sharda Singh held a telephonic hearing.  (*Id.* at 49–79).  At that hearing, Kaelin appeared with Jessica Lindhorst, a non-attorney representative,[6] and testified.  (*Id.* at 49, 54–72).  On April 4, 2022, the ALJ issued a written decision, in which she concluded that Kaelin was not disabled within the meaning of the Social Security Act.  (*Id.* at 17–29).  The ALJ reasoned that Kaelin maintained a residual functional

---

[3] The undersigned conducted a plenary review of the entire administrative record, familiarity with which is presumed.  The undersigned assumes knowledge of the facts surrounding Kaelin's medical history and does not recite them in detail, except as relevant to the analysis set forth in this Report and Recommendation.

[4] Some of the filings, including the ALJ's written decision, state that Kaelin filed his application on August 31, 2020.  (*See, e.g.*, ECF Nos. 11 at 17, 80, 82, 101, 103; 13 at 6; 14 at 6).  But the Application Summary for Disability Insurance Benefits states that Kaelin filed his application on September 8, 2020.  (ECF No. 11 at 233).

[5] All page numbers to documents filed on ECF refer to the pagination generated by ECF on the top right corner of a given page, not the sequential numbering of the SSA Record provided on the bottom right corner of the page.

[6] A Social Security claimant may appear with a non-attorney representative before a Social Security proceeding.  *See* 42 U.S.C. § 406(a)(1) ("The Commissioner of Social Security may prescribe rules and regulations governing the recognition of agents or other persons, other than attorneys as hereinafter provided, representing claimants before the Commissioner of Social Security . . . ."); 20 C.F.R. § 404.1705(b) (providing that a Social Security claimant "may appoint any person who is not an attorney to be [their] representative in dealings with us" if the person satisfies certain requirements).

capacity (RFC) to perform "light work," except as follows.  (*Id.* at 22).  "[H]e requires a sit/stand

option allowing him to sit for 1-2 minutes after 20 minutes of standing.  He needs to use a cane

in the right dominant hand for balance and ambulation.  He can never climb ladders, ropes, or

scaffolds.  He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.

He is limited to frequent fine and gross hand manipulations bilaterally.  He must avoid

concentrated exposure to fumes, odors, dusts, and gases.  He is further limited to understanding,

remembering, and carrying out simple routine repetitive non-complex tasks with occasional

contact with supervisors, coworkers, and the general public.  He is limited to a low stress

environment defined as occasional decisionmaking, judgment, and changes in routine work

setting."  (*Id.*).  Kaelin sought review from the Appeals Council (*id.* at 227–29), who denied his

request on February 3, 2023 (*id.* at 5–7).  Kaelin passed away on July 11, 2022, while awaiting

determination from the Appeals Council.  (*See* ECF Nos. 1 (Compl.) at 1; 1-1 at 2).  Chevalier

filed this action as survivor of Kaelin, and on behalf of her daughter, K.K., a minor, who is

Kaelin's only child.  (ECF No. 1 at 1).

### B.    Record Before the ALJ

Both parties have provided summaries of the testimonial, medical, opinion, and

vocational evidence contained in the administrative record.  (ECF Nos. 13 at 7–23; 14 at 7–9,

14).  Based on an independent and thorough examination of the record, the undersigned finds

that the parties' summaries of the evidence are largely comprehensive and accurate.  Thus, the

undersigned adopts these summaries and discusses the record in more detail only as necessary to

recommend disposition of the issues raised.  *See, e.g.*, *Lieberman v. Kijakazi*, No. 19-cv-2870,

2022 WL 20487096, at *2 (S.D.N.Y. July 8, 2022), *report and recommendation adopted*, 2024

WL 985112, at *1 (S.D.N.Y. Mar 7, 2024).

## II.    LEGAL STANDARDS

### A.    Standard of Review

This Court "engage[s] in limited review" of the Commissioner's decision. *Schillo v. Saul*, 31 F.4th 64, 74 (2d Cir. 2022). The Court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Id.*; *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "The substantial evidence standard is a very deferential standard of review," such that it is not the function of the Court "to determine *de novo* whether a plaintiff is disabled." *Schillo*, 31 F.4th at 74 (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *Id.* "[O]nce an ALJ finds facts, [this Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (internal quotation marks omitted).

But "where an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration and internal quotation marks omitted). Thus, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the

ALJ's rationale is unclear in relation to the evidence in the record, the Court may remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *accord Fowlkes v. Adamec*, 432 F.3d 90, 98 (2d Cir. 2005).

### B.    Statutory Disability

Under the Social Security Act, a claimant is disabled when the claimant lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Schillo*, 31 F.4th at 69–70.  The claimant is eligible for disability benefits

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

The Social Security Regulations, 20 C.F.R. § 404.1520(a)(4)(i)–(v), set forth a five-step sequential analysis for evaluating whether a person is disabled under the Social Security Act. *See Schillo*, 31 F.4th at 70.  "If at any step a finding of disability or nondisability can be made, the Commissioner will not review the claim further."  *Id.* (alteration and internal quotation marks omitted).  Under the five-step process, the Commissioner determines the following:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe physical or mental impairment, or combination of severe impairments;[7]
> (3) whether the impairment (or combination) meets or equals the severity of one of the impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1

---

[7] A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

("Listing of Impairments");[8]
(4) whether, based on an assessment of the claimant's residual functional
capacity, the claimant can perform any of her past relevant work;[9] and
(5) whether the claimant can make an adjustment to other work given the
claimant's residual functional capacity, age, education, and work experience.[10]

*Schillo*, 31 F.4th at 70 (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v)).  "At step three, the

[Commissioner] determines whether the impairment which enabled the claimant to survive step

two is on the list of impairments presumed severe enough to render one disabled; if so, the

claimant qualifies."  *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003).  But "[i]f the claimant's

impairment is not on the list, the inquiry proceeds to step four."  *Id.*  "The claimant bears the

burden of proof in the first four steps of the sequential inquiry."  *Schillo*, 31 F.4th at 70.  "In step

five, the burden shifts, to a limited extent, to the Commissioner to show that other work exists in

significant numbers in the national economy that the claimant can do."  *Id.*  "Because the shift in

step five is limited, the Commissioner need not provide additional evidence of the claimant's

residual functional capacity."  *Id.* (internal quotation marks omitted).

### III.    THE ALJ'S DECISION

To assess Kaelin's disability claim, the ALJ applied the five-step sequential analysis.

(ECF No. 11 at 17–29); 20 C.F.R. § 404.1520(a)(4)(i)–(v).  At step one, the ALJ concluded that

Kaelin had not engaged in substantial gainful activity since October 9, 2018, the alleged onset

date.  (ECF No. 11 at 19).  At step two, the ALJ concluded that Kaelin had the following severe

---

[8] Listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing
are found in Appendix 1 to Part 404, Subpart P of the SSA regulations.  20 C.F.R §§ 404.1520(a)(4)(iii), (d),
416.920(a)(4)(iii), (d).  If the claimant's impairments do not satisfy the criteria of a listed impairment at step three,
the Commissioner moves on to step four and must determine the claimant's residual functional capacity (RFC).  20
C.F.R. §§ 404.1520(e), 416.920(e).
[9] A claimant's RFC represents "the most [the claimant] can still do despite [their] limitations."  20 C.F.R.
§§ 404.1545(a)(1), 416.945(a)(1).
[10] To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in
the national economy that the claimant, considering his or her RFC and vocational factors, can perform.  20 C.F.R.
§ 404.1560(c).

impairments: lumbar spine disorder with radiculopathy, carpal tunnel syndrome, diabetes, asthma, obesity, depressive disorder, anxiety disorder, attention deficit hyperactivity disorder (ADHD), and posttraumatic stress disorder (PTSD).  (*Id.*).  The ALJ also found that Kaelin had one non-severe impairment, sleep apnea.  (*Id.* at 19–20).

At step three, the ALJ determined that Kaelin's impairments, individually or combined, did not meet, or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 20–22).  The ALJ found that Kaelin's impairments did not meet or medically equal Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 3.03 (asthma), 9.00 (endocrine disorders), 11.08 (spinal cord disorders), 11.14 (peripheral neuropathy), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), 12.15 (trauma- and stressor-related disorders).  (*Id.*).

At step four, the ALJ assessed Kaelin's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he requires a sit/stand option allowing him to sit for 1-2 minutes after 20 minutes of standing.  He needs to use a cane in the right dominant hand for balance and ambulation.  He can never climb ladders, ropes, or scaffolds.  He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  He is limited to frequent fine and gross hand manipulations bilaterally.  He must avoid concentrated exposure to fumes, odors, dusts, and gases.  He is further limited to understanding, remembering, and carrying out simple routine repetitive non-complex tasks with occasional contact with supervisors, coworkers, and the general public.  He is limited to a low stress environment defined as occasional decisionmaking, judgment, and changes in routine work setting.

(*Id.* at 22).  In reaching this conclusion, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in accordance with 20 C.F.R. §§ 404.1529 and 416.929 and Social

Security Ruling 16-3p.  (*Id.*).  The ALJ also "considered the medical opinion(s) and prior administrative medical finding(s)" in accordance with 20 C.F.R. §§ 404.1520c.  (*Id.*).  In reaching this determination, the ALJ used a two-step process.  First, the ALJ found that the evidence revealed medical impairments that could reasonably be expected to cause the symptoms Kaelin had alleged.  (*Id.* at 22–23).  Second, the ALJ determined that "the intensity, persistence and limiting effects of [Kaelin's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (*Id.* at 23).

At step five, the ALJ concluded that based on Kaelin's age (49 years old, defined as a younger individual, on the alleged disability onset date, but subsequently changed age category to closely approaching advanced age), education, work experience, and residual functional capacity, there were jobs in significant number in the national economy that Kaelin could perform.  (*Id.* at 27–28).  The ALJ credited the vocational expert's testimony that an individual with Kaelin's age, education, work experience, and residual functional capacity could perform the duties of a price marker, routing clerk, and mail sorter.  (*Id.* at 26–27).  Thus, Kaelin was "not disabled."  (*Id.* at 28–29).

## IV.    DISCUSSION

Chevalier makes several arguments that challenge (1) the ALJ's RFC determination (in step four); and (2) ALJ's determination that there were jobs in significant number in the national economy that Kaelin could perform (in step five).  (ECF Nos. 13 at 25–29; 15 at 2–10).  As explained below, the undersigned finds that the ALJ's determinations were supported by substantial evidence and that no legal error occurred.

**A.      The ALJ's RFC Determination Was Supported by Substantial Evidence**

Chevalier makes a series of sub-arguments that the ALJ erred in determining Kaelin's RFC without substantial evidence (in step four).  (ECF Nos. 13 at 25–27; 15 at 5–9).  First, Chevalier argues that there is no substantial evidence in the record that Kaelin could perform either light or sedentary work.  (ECF No. 13 at 25–26).  Second, Chevalier argues that the ALJ erred by relying on the opinions of non-examining consultants, Dr. M. Angelotti and Dr. S. Gahndi, because their opinions were stale.  (*Id.* at 26–27).  Third, Chevalier argues, on reply, that the ALJ erred in weighing the physicians' opinions.  (ECF No. 15 at 7–9).  Fourth, Chevalier argues, also on reply, that the ALJ improperly substituted her own judgment for competent medical opinion about Kaelin's physical impairments, including carpel tunnel syndrome and back pain.  (ECF No. 15 at 6–9).  Fifth, Chevalier argues, further on reply, that the ALJ improperly substituted her own judgment for the opinion of psychological evaluator, Dr. Konstantinos Tsoubris.  (*Id.* at 5).  The Court first addresses whether substantial evidence supports the ALJ's RFC determination as a whole, and then addresses each of Chevalier's arguments in turn.

1.   Substantial Evidence Supports the ALJ's RFC Determination

The ALJ found that Kaelin had the RFC to perform "light work,"[11] except that he (a) required "a sit/stand option allowing him to sit for 1-2 minutes after 20 minutes of standing," (b) needed "to use a cane in the right dominant hand for balance and ambulation," (c) could

---

[11] "Light work is defined as: work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *Butts v. Barnhart*, 388 F.3d 377, 382 n.2 (2d Cir. 2004) (alteration omitted) (quoting 20 C.F.R. § 404.1567(b)).

"never climb ladders, ropes, or scaffolds," (d) could "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl," (e) was "limited to frequent fine and gross hand manipulations bilaterally," (f) had to "avoid concentrated exposure to fumes, odors, dusts, and gases," (g) was "limited to understanding, remembering, and carrying out simple routine repetitive non-complex tasks with occasional contact with supervisors, coworkers, and the general public," and (h) was "limited to a low stress environment defined as occasional decisionmaking, judgment, and changes in routine work setting." (ECF No. 11 at 22). In support of these findings, the ALJ extensively cited Kaelin's treating source records, the findings and opinions of consultative physicians, and Kaelin's reported activities. (*See id.* at 22–27). As explained below, the ALJ's conclusions are supported by substantial evidence. More specifically, the record reveals that Kaelin's medically determinable impairments could reasonably be expected to cause the symptoms alleged—an issue undisputed by the parties. (*Id.* at 22–23). But the record also supports the ALJ's finding that the intensity, persistence, and limiting effects of Kaelin's alleged symptoms are not entirely consistent with the medical evidence and other evidence in the record. (*Id.*).

As the ALJ explained, Kaelin was limited by several physical impairments, including lumbar spine disorder with radiculopathy, bilateral carpal tunnel syndrome post bilateral release surgeries, asthma, type two diabetes without complication, and obesity. (*Id.* at 24). Kaelin's most significant impairment was bilateral carpal tunnel syndrome. (*Id.*). Substantial evidence supports the ALJ's finding as to carpal tunnel syndrome and the ALJ's conclusion that Kaelin was limited to no more than frequent manipulation of the hands for fine and gross motor activity. (*Id.* at 22, 27). As the ALJ explained, while Kaelin's bilateral carpal tunnel syndrome was assessed as severe before undergoing carpal release, he appeared neurologically intact apart from

numbness in his hands/wrists.  (*Id.* at 24–25).  In 2020 and 2021, Kaelin saw Dr. Simon H. Chin, who assessed severe bilateral carpal tunnel syndrome.  (*See* ECF Nos. 11-2 at 152; 11-3 at 11, 27, 63; 11-4 at 68).  Upon examination, Dr. Chin found numbness along the bilateral radial, ulnar, and median nerve distributions and positive Tinel's sign.  (*See* ECF Nos. 11-2 at 152; 11-3 at 11, 27, 63; 11-4 at 68).  But Dr. Chin found that Kaelin was "otherwise neurologically intact" along the same nerve distributions throughout this same period.  (*See* ECF Nos. 11-2 at 152; 11-3 at 11).  In July 2021, Kaelin underwent left endoscopic carpal tunnel release.  (ECF No. 11-5 at 34).  In August 2021, Kaelin reported that he was doing well, saying "he already has some improved sensation of the median nerve distribution of the left hand."  (*Id.* at 37).  Upon examination, Dr. Chin observed that Kaelin was "neurologically intact."  (*Id.*).  In September 2021, Kaelin underwent right endoscopic carpal tunnel release.  (*Id.* at 38).  Later in September 2021, Kaelin followed up with Dr. Chin, who recommended hand therapy.  (*Id.* at 43).  In November 2021, Dr. Chin observed that Kaelin was "neurologically intact" and recommended continued hand therapy.  (*Id.* at 44).  In December 2021, Dr. Chin noted that Kaelin's left hand was doing well and he had "recovered most the strength that was there and is healing."  (*Id.* at 49).  While Kaelin's right had was "still pretty weak" and "not normal yet," he had "about 20-pound grip strength and ha[d] improved sensation."  (*Id.*).

The ALJ's finding as to Kaelin's bilateral carpal tunnel syndrome is also substantially supported by the findings and opinions of consultative examiner, Dr. Kautilya Puri, and non-examining consultants, Dr. Angelotti and Dr. Gahndi.  (ECF No. 11 at 25–27).  Kaelin saw Dr. Puri for a consultative examination in April 2021, before he underwent carpal tunnel release.  (ECF No. 11-3 at 74–79).  Dr. Puri performed a hand exam, which revealed tenderness in the hands, but intact hand and finger dexterity, and full (5/5) grip strength bilaterally.  (*Id.* at 76–77).

Radiologic imaging of the left hand was negative.  (*Id.* at 79).  Based on her examination, Dr.

Puri opined that Kaelin had no objective limitations to fine motor or gross motor activity.  (*Id.*

at 77).  Similarly, Dr. Angelotti and Dr. Gahndi opined that Kaelin did not demonstrate any

limitations using hands for fine or gross motor activities.  (ECF No. 11 at 90–93, 113–16).

Because these opinions were based on reviews of the record and/or consistent with the treatment

record, the ALJ appropriately found these opinions persuasive.  (*Id.* at 26–27).

On reply, Chevalier argues that "[t]here is no medical evidence of record which holds

that [Kaelin] had full function of either hand throughout the relevant time period."  (ECF No. 15

at 7).  But this argument fails.  To determine Kaelin's RFC for light work, the ALJ was not

required to find that Kaelin had "full function of either hand."  Instead, the ALJ only needed to

assess Kaelin's ability to perform tasks despite his limitations, as defined by 20 C.F.R.

§ 404.1545(a) ("Your residual functional capacity is the most you can still do despite your

limitations.").  Here, the ALJ reasonably relied on Dr. Chin's treatment notes, Dr. Puri's

examination, and the opinions of consultative physicians to determine that Kaelin's RFC was

restricted to no more than frequent manipulation of the hands for fine and gross motor activity.

Thus, substantial evidence supports the ALJ's findings about Kaelin's carpal tunnel syndrome.

Substantial evidence also supports the ALJ's finding that Kaelin's back impairment

appeared to be generally moderate in severity.  (ECF No. 11 at 24).  This finding is supported by

Kaelin's treatment records.  In June 2019, Dr. John Mitamura observed tenderness to Kaelin's

"lumbar spine with paravertebral spasm with pain radiating to buttocks musculature."  (ECF No.

11-3 at 86).  Dr. Mitamura assessed lumbar spinal instability with radiculopathy.  (*Id.*).  In March

2020, NCV-EMG of the lower extremities showed evidence of bilateral L5-S1 radiculopathy and

bilateral mixed sensorial peripheral neuropathy.  (ECF No. 11-4 at 8).  Between October 2020

and October 2021, Kaelin saw Dr. Surinder P. Jindal for lumbosacral pain.  (ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64).  During these visits, neurologic exams showed 4/5 strength in both lower extremities with tenderness and restricted range of motion in his lumbar spine.  (ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64).  And Kaelin ambulated, favoring the left side.  (ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64).  Throughout this period, Dr. Jindal recommended conservative pain management and administered trigger point injections, which relieved spasms and brought the "pain down 50%" or "to 3 or 4 level."  (ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64).

The ALJ's finding about Kaelin's back impairment is reinforced by Dr. Puri's consultative examination and opinion.  During Dr. Puri's examination, Kaelin reported a history of back pain since 2010.  (ECF No. 11-3 at 74).  Kaelin reported engaging in occasional cooking, cleaning, laundering, and shopping; and he was able to bathe and dress.  (*Id.* at 75).  As for Kaelin's general appearance, gait, and station, Dr. Puri found that Kaelin appeared to be in no acute distress.  (*Id.*).  His gait was normal.  (*Id.*).  He could stand on heels and toes but said he cannot walk on them.  (*Id.*).  He performed a full squat moderately halfway decreased.  (*Id.*).  His stance was normal.  (*Id.*).  He used no assistive devices.  (*Id.*).  He needed no help changing for the exam or getting on and off the examination table.  (*Id.*).  He was also able to rise from a chair without difficulty.  (*Id.*).  Upon examination, Dr. Puri found restricted lumbar range of motion with moderate tenderness, but negative straight leg raising.  (*Id.* at 76).  He found full (5/5) strength in all extremities.  (*Id.*).  Dr. Puri opined that Kaelin "had mild limitations to his gait and to his activities of daily living on examination today with moderate to marked limitations to squatting, bending, stooping, kneeling, and moderate limitations to lifting weights."  (*Id.* at 77).

Dr. Puri recommended that Kaelin "not carry on repetitive movements and to be careful in dark situations." (*Id.*).

As the ALJ explained, Dr. Puri's opinion was "partially persuasive in limiting [Kaelin] to the light range of exertion." (ECF No. 11 at 25). Dr. Puri's opinion, which indicated mild gait disturbance and moderate lifting restrictions, was supported by his exam results and consistent with the treatment record. (*Id.* at 25–26). But there was "little support for marked postural difficulties" because Kaelin's back complaints were "largely unsupported with little support in squatting, bending, stooping, and kneeling." (*Id.* at 26). In that respect, the ALJ found Dr. Puri's opinion inconsistent with the record and unsupported by his objective findings. (*Id.*).

The ALJ's finding that Kaelin was limited to light work was also substantially supported by the opinions of Dr. Angelotti and Dr. Gahndi. Both doctors reviewed the medical evidence, which included Dr. Jindal's treatment notes, and opined that Kaelin was limited to light work with certain postural limitations. (*Id.* at 90–93, 113–16).

For these reasons, the ALJ reasonably concluded that Kaelin was "limited to a restricted range of light work." (*Id.* at 27). The ALJ also reasonably added certain limitations to Kaelin's ability to do light work: Kaelin needed "a sit/stand option allowing him to sit for 1-2 minutes after 20 minutes of standing," he needed "a cane in the right dominant hand for balance and ambulation," he could "never climb ladders, ropes, or scaffolds," and he could "occasionally climb ramps and stairs, balance, stoop, kneel, crouch and drawl." (*Id.* at 27).

In sum, substantial evidence supports the ALJ's finding that Kaelin had the RFC to perform light work with certain limitations. This finding is backed by the medical evidence, Dr. Puri's consultative examination, consultative opinions, and Kaelin's reported daily activities. The ALJ's RFC determination also accurately reflects the most Kaelin could do despite his

limitations. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) ("A claimant's RFC is the most he can still do despite his limitations.") (alterations and internal quotation marks omitted).[12]  And Chevalier did not meet her burden to prove that Kaelin's RFC was more restricted than the ALJ found. *See Schillo*, 31 F.4th at 70 ("The claimant bears the burden of proof in the first four steps of the sequential inquiry.").[13]  Chevalier fails to show that a reasonable factfinder would have to conclude that Kaelin could not perform light work with the given limitations. *See Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (internal quotation marks omitted).

    2.  <u>The Opinions of Dr. Angelotti and Dr. Gahndi Were Not Rendered Stale</u>

Chevalier argues that the ALJ erred by relying on the opinions of non-examining consultants, Dr. Angelotti and Dr. Gahndi, because their opinions were stale.  (ECF No. 13 at 26–27).  First, Chevalier explains that Dr. Angelotti and Dr. Gahndi performed their reviews almost one year before Kaelin's administrative hearing.  (*Id.* at 26).  Second, Chevalier asserts these opinions were stale because later medical records showed a deterioration in Kaelin's bilateral carpal tunnel syndrome, as he underwent bilateral carpal tunnel release after Dr. Angelotti and Dr. Gahndi authored their opinions in May and July 2021.  (*Id.* at 26).  Third, Chevalier asserts that these opinions were stale because in June 2021, Dr. Jindal evaluated

---

[12] *See also* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); 20 C.F.R. § 416.945(a)(1) (same).
[13] *Mendez Valentin v. Comm'r of Soc. Sec.*, 820 F. App'x 71, 72 (2d Cir. 2020) (Summary Order) ("Valentin does not identify any evidence supporting a more limited RFC."); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (Summary Order) ("Smith had a duty to prove a more restrictive RFC, and failed to do so.").

Kaelin for loss of balance when walking, and because Dr. Jindal provided trigger point injections in the months after their May and July 2021 opinions.  (*Id.*).

To start, the mere passage of time between the opinions of Dr. Angelotti and Dr. Gahndi (dated May and July 2021, respectively[14]) and the ALJ's April 2022 decision,[15] does not render their opinions stale.  *See Rodriguez v. Kijakazi*, No. 21-cv-2358, 2022 WL 3211684, at *15 (S.D.N.Y. Aug. 9, 2022) ("The passage of time does not render an opinion stale . . . .") (alteration omitted).[16]  Nor are those opinions automatically rendered stale by Kaelin's later medical records or his subsequent carpal tunnel release procedures.  "No case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record."  *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (Summary Order).  "Rather, a medical opinion does not become stale when new material is added to the record unless the additional material raises doubts as to the reliability of the opinion."  *Giron v. Kijakazi*, No. 22-cv-6226, 2023 WL 6121764, at *11 (S.D.N.Y. Sept. 19, 2023); *see Camille*, 652 F. App'x at 28 n.4 (holding that medical opinion was not rendered stale by subsequent treatment records two to nine months later, because medical opinions did not differ materially

---

[14] *See* ECF No. 11 at 90–93, 113–16.

[15] *See* ECF No. 11 at 79.

[16] *See also Irma Y.D. v. Comm'r of Soc. Sec.*, No. 22-cv-6658, 2023 WL 5274650, at *4 (S.D.N.Y. Aug. 16, 2023) ("[T]he mere passage of time does not cause a medical opinion to expire . . . .") (internal quotation marks omitted); *Moss v. Comm'r of Soc. Sec.*, No. 21-cv-1352, 2022 WL 4365349, at *14 (S.D.N.Y. Sept. 20, 2022) ("The passage of time does not render an opinion stale . . . .") (alteration omitted); *Sagman v. Comm'r of Soc. Sec.*, No. 20-cv-4257, 2021 WL 5831114, at *13 (S.D.N.Y. Nov. 16, 2021) (same), *report and recommendation adopted*, 2021 WL 5831114, at *1 (S.D.N.Y. Dec. 8, 2021).

from each other).[17]

Here, Kaelin's subsequent medical treatment notes, and bilateral carpal tunnel release procedures (in July and September 2021), did not raise doubts about the reliability of Dr. Angelotti's and Dr. Gahndi's opinions.  Dr. Angelotti and Dr. Gahndi both opined that Kaelin did not demonstrate limitations using hands for fine or gross motor activities (other than limitations for lifting and carrying 10 pounds frequently and 20 pounds occasionally).  (ECF No. 11 at 90–93, 113–16).  Kaelin's bilateral carpal tunnel release procedures did not raise doubts about these opinions.  Dr. Chin's post-surgery treatment notes reflected that Kaelin was doing well, had improved sensation in his hands, was neurologically intact, was regaining strength, and was healing.  (*See* ECF No. 11-5 at 37–38, 43–44, 49).  Thus, Dr. Chin's treatment notes, after Dr. Angelotti's and Dr. Gahndi's reviews, revealed *improvement* in Kaelin's hand symptoms with surgery, and did not undermine Dr. Angelotti's and Dr. Gahndi's earlier opinions.  *See Camille*, 625 F. App'x at 28 n.4; *Giron*, 2023 WL 6121764, at *11.

Similarly, Dr. Jindal's June 2021 evaluation for loss of balance for walking, and his continued administration of trigger point injections through October 2021, did not undermine Dr. Angelotti's and Dr. Gahndi's earlier opinions.  *See Camille*, 625 F. App'x at 28 n.4; *Giron*, 2023

---

[17] *Cf. Hidalgo v. Bowen*, 822 F.2d 294, 295–96, 298 (2d Cir. 1987) (holding that medical opinion based on incomplete medical record was undermined by conflicting opinions from two treating physicians, and may have been altered by review of additional medical records containing clinical findings that confirmed treating physicians' diagnosis), *limited by regulation as stated in Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644–45 (2d Cir. 2020) (Summary Order) (remanding where ALJ failed to consider whether older, pre-hospitalization evidence, concerning claimant's ability to perform activities of daily life, were rendered stale by post-hospitalization evidence not analyzed by ALJ, which stated that claimant could no longer lift weights, walk long distances, and was limited in carrying out activities of daily life resulting from weakness and fatigue caused by chronic abdominal pain from pancreatitis); *see also Edwards v. Comm'r of Soc. Sec. Admin.*, No. 22-cv-4345, 2023 WL 6173526, at *16 (S.D.N.Y. Sept. 22, 2023) ("[A] medical opinion is not stale merely because it pre-dates other evidence in the record.") (alteration omitted); *Teresi v. Comm'r of Soc. Sec.*, No. 19-cv-1268, 2020 WL 5105163, at *18 (S.D.N.Y. Aug. 31, 2020) (holding that medical opinion "rendered 2 years prior to the [ALJ] hearing" was not stale); *Cepeda v. Comm'r of Soc. Sec.*, No. 19-cv-4936, 2020 WL 6895256, at *10 (S.D.N.Y. Nov. 24, 2020) (same); *Santiago v. Comm'r of Soc. Sec.*, No. 19-cv-2051, 2020 WL 1922363, at *5–6 (S.D.N.Y. Apr. 21, 2020) (same).

WL 6121764, at *11.  Dr. Gahndi's opinion explicitly noted Dr. Jindal's June 2021 finding that

Kaelin was having trouble balancing while walking.  (*See* ECF Nos. 11 at 116 ("6/11/21 – Low

back pain – ambulating favoring left side.  SLR 35 degrees.  Trigger points in L4, L5, and gluteal

muscles.")).  Also, Kaelin's balance issues predated the opinions of Dr. Angelotti and Dr.

Gahndi.  Dr. Jindal's treatment notes, dating back to October 2020, revealed that Kaelin was

ambulating, favoring the left side.[18]  And both Dr. Angelotti and Dr. Gahndi noted these

findings.  (ECF No. 11 at 92, 115).  Similarly, Kaelin's continued trigger point injections did not

render Dr. Angelotti's and Dr. Gahndi's opinions stale.  Both Dr. Angelotti and Dr. Gahndi

explicitly noted that Dr. Jindal was administering trigger point injections to treat Kaelin's back

pain, as far back as October 2020.  (ECF No. 11 at 92–93, 115–16).[19]  Thus, both doctors

understood that Kaelin was receiving trigger point injections for back pain when they issued their

opinions.  And Chevalier has not shown how evidence of *continued* injections would have

changed their assessments.  Thus, Dr. Jindal's later treatment notes about Kaelin's trigger point

injections and his issues balancing while walking do not undermine Dr. Angelotti's and Dr.

Gahndi's earlier opinions.  *See Camille*, 625 F. App'x at 28 n.4; *Giron*, 2023 WL 6121764, at

*11.

### 3.  The ALJ Appropriately Weighed the Medical Opinions

Chevalier argues, on reply, that the ALJ did not appropriately weigh the opinions of Dr.

Chin, Dr. Puri, Dr. Mitamura, Dr. Jindal, Dr. Angelotti, and Dr. Gahndi.  (ECF No. 15 at 7–9).

First, she argues that the ALJ should have found Dr. Chin's opinion persuasive that Kaelin's

"right hand post-surgery was still approximately 50% disabled and left (non-dominant) hand

---

[18] *See* ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64.  For example, in November 2020, Kaelin reported to Dr. Jindal that "[w]hen he walks, the legs give out."  (ECF No. 11-3 at 113).
[19] *See* ECF Nos. 11-1 at 119; 11-3 at 44–45, 83, 113; 11-4 at 26, 42, 44, 50, 58, 62, 64.

10% disabled." (*Id.* at 7). Second, she argues that the ALJ erred in finding Dr. Mitamura's and Dr. Jindal's opinions persuasive because the ALJ did not explain what she found in the record that made those opinions inconsistent with, and unsupported by, the record. (*Id.*). Third, she argues that the ALJ erred in finding that the part of Dr. Puri's opinion (that found Kaelin had moderate to marked limitations in squatting, bending, stooping, and kneeling), was not persuasive, because the ALJ did not explain what in the record detracted from Dr. Puri's opinion. (*Id.* at 8). Fourth, she argues that the ALJ erred in finding Dr. Angelotti's and Dr. Gahndi's opinions persuasive because those opinions were stale. (*Id.* at 8–9). For the reasons below, these arguments fail.

As the Second Circuit has repeatedly explained, "an ALJ is free to . . . choose between properly submitted medical opinions," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (alteration and internal quotation marks omitted), and the Court must "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).[20] "The most important factors ALJs consider when they evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency." *Gauda v. Comm'r of Soc. Sec.*, No. 23-594, 2024 WL 886595, at *2 (2d Cir. Mar. 1, 2024) (Summary Order) (alterations omitted) (quoting 20 C.F.R. § 404.1520c(a)). "The regulations further require the agency to explain how it considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in its determination or decision." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022) (Summary Order) (alterations and internal quotation marks omitted) (quoting 20 C.F.R. § 404.1520c(b)(2)).

---

[20] *See also McGonagle v. Kijakazi*, No. 22-637, 2022 WL 17724696, at *1 (2d Cir. Dec. 16, 2022) (Summary Order).

Here, the ALJ appropriately weighed Dr. Chin's opinion. As the ALJ explained, Dr.

Chin's opinion that Kaelin had a 50% disability in his right hand and a 10% disability in his left

hand was vague and did not state what specific functional restrictions resulted from those

disability percentages. (ECF No. 11 at 26).[21] This is a sufficient basis to discount Dr. Chin's

opinion. "Under the Regulations, a better explained medical opinion, as a general matter, is

given more weight." *Giron*, 2023 WL 6121764, at *14 n.16.[22] Further, "a medical opinion must

discuss both a claimant's limitations and what the claimant is still capable of doing despite those

limitations." *Sherwood v. Kijakazi*, No. 21-cv-10847, 2023 WL 2662804, at *5 (S.D.N.Y. Mar.

28, 2023). Because Dr. Chin's opinion was vague and did not state what specific functional

restrictions resulted from his assessed disability percentages, the ALJ appropriately discounted

his opinion.

Similarly, the ALJ appropriately weighed the opinions of Dr. Mitamura and Dr. Jindal.

As the ALJ explained, their opinions were completed for workers' compensation purposes.

(ECF No. 11 at 26). They opined that Kaelin could not return to work due to his pain, that he

had 100% temporary impairment, and 100% temporary disability.[23] As the ALJ explained, these

---

[21] *See* ECF No. 11-5 at 49 ("Still healing right hand, approximately 50% disabled, left hand 10% stable. He will continue with hand therapy. Still kept out of work and follow up with me in 4 weeks.").

[22] *See* 20 C.F.R. § 1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); *see also Colgan v. Kijakazi*, 22 F.4th 353, 361 n.5 (2d Cir. 2022) (explaining "the obvious principle that a better explained medical opinion will, as a general matter, be given more weight by the ALJ"); *Martinez v. Kijakazi*, No. 22-cv-9215, 2023 WL 8361356, at *7 (S.D.N.Y. Dec. 4, 2023) ("The ALJ's explanation that Dr. Healy did not articulate reasons or provide explanations for his conclusion is a sufficient basis to discount that opinion under the regulations applicable to Martinez's application, which state that the more a medical source presents relevant evidence to support a medical opinion and the better an explanation a source provides for a medical opinion, the more weight the Commissioner will give that medical opinion.") (alterations and internal quotation marks omitted), *report and recommendation adopted sub nom.*, *Martinez v. O'Malley*, 2024 WL 422291 (S.D.N.Y. Jan. 15, 2024).

[23] *See* ECF Nos. 11-3 at 85, 88, 91, 94, 98, 101, 104, 112, 116, 120, 124, 128, 132, 136; 11-4 at 2, 6, 21, 25, 29, 34, 38, 41, 46, 54, 61.

opinions referenced few, if any, objective findings, and offered no discussion of specific examination results or diagnostics that supported their findings.  (ECF No. 11 at 26).  They also did not provide specific assessments of Kaelin's functional limitations and/or abilities.  (*Id.*).  As explained above, a better explained medical opinion is generally given more weight.  Because these two opinions provided little, if any, explanation, the ALJ appropriately discounted their opinions.  *See Giron*, 2023 WL 6121764, at *14 n.16; 20 C.F.R. § 404.1527(c)(3).[24]  And, as explained above, "a medical opinion must discuss both a claimant's limitations and what the claimant is still capable of doing despite those limitations."  *Sherwood*, 2023 WL 2662804, at *5.  These two opinions did neither.[25]  And, under the governing regulations, the ALJ should not, and could not, have considered these opinions because they were conclusory statements, infringing on a determination that was reserved to the Commissioner.  *See Schillo*, 31 F.4th at 70 ("[T]he ultimate finding on the claimant's residual functional capacity is reserved to the Commissioner.").[26]

The ALJ also appropriately weighed Dr. Puri's opinion as partially persuasive.  "An ALJ may accept parts of a doctor's opinion and reject others."  *Camille*, 652 F. App'x at 29 n.5.  "Thus, it is entirely within the ALJ's purview to find an opinion partially persuasive."  *Reece v. Kijakazi*, No. 22-cv-674, 2023 WL 6211788, at *12 (S.D.N.Y. Sept. 25, 2023) (internal quotation marks omitted) (collecting cases).  Chevalier's contention that the ALJ failed to

---

[24] *See also supra* note 22.

[25] *See* ECF Nos. 11-3 at 85, 88, 91, 94, 98, 101, 104, 112, 116, 120, 124, 128, 132, 136; 11-4 at 2, 6, 21, 25, 29, 34, 38, 41, 46, 54, 61.

[26] *See also Sherwood*, 2023 WL 2662804, at *4 ("[T]he governing regulations indicate that the ALJ should not and could not have considered these doctor's assertions that Plaintiff was 100% temporarily disabled as conclusory statements by a claimant's provider concerning issues reserved to the Commissioner—for instance, whether the claimant is disabled under the Act—are inherently neither valuable nor persuasive and will not be analyzed by the ALJ.") (internal quotation marks omitted); 20 C.F.R. § 404.1520b(c), (c)(3) (explaining that "[s]tatements on issues reserved to the Commissioner" is "[e]vidence that is inherently neither valuable nor persuasive"); 20 C.F.R. § 416.920b(c), (c)(3) (same); 20 C.F.R. § 404.1527(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .").

specify what detracted from Dr. Puri's opinion about marked postural difficulties (ECF No. 15 at 8),[27] is meritless.  The ALJ addressed both the supportability and consistency factors.  (*See* ECF No. 11 at 26).  The ALJ explained that there was little support for marked postural difficulties because Kaelin's back complaints were largely unsupported with little support for marked difficulties in squatting, bending, stooping, and kneeling.  (*Id.*).  Earlier in the ALJ's decision, the ALJ explained that Kaelin's back impairment appeared "generally moderate in severity with few significant problems."  (*Id.* at 24).  That finding, based on the ALJ's review of Kaelin's treatment records (*id.* at 24–25), is substantially supported in the record.  *See supra* Section IV.A.1.  Thus, the part of Dr. Puri's opinion that assessed marked postural difficulties was unsupported by, and inconsistent with, the record evidence, which revealed a back impairment that was generally moderate in severity with few significant problems.  The ALJ also explained that this part of Dr. Puri's opinion was unsupported by Dr. Puri's objective findings.  (ECF No. 11 at 26).  As the ALJ explained earlier in her opinion, Dr. Puri's findings revealed restricted lumbar range of motion with moderate tenderness but negative straight leg raising and full 5/5 strength in all extremities.  (*Id.* at 25; *see* ECF No. 11-3 at 76).  Dr. Puri did not explain how those objective findings supported marked postural difficulties.  (*See* ECF No. 11-3 at 76–77).  Thus, the ALJ appropriately weighed Dr. Puri's opinion.

Finally, Chevalier's contention that the ALJ erred in finding Dr. Angelotti's and Dr. Gahndi's opinions persuasive because those opinions were stale (ECF No. 15 at 8–9), is meritless, for the reasons explained above in Section IV.A.2.

---

[27] Dr. Puri opined, "[t]he patient had mild limitations to his gait and to his activities of daily living on examination today with moderate to marked limitations to squatting, bending, stooping, kneeling, and moderate limitations to lifting weights."  (ECF No. 11-3 at 77).

4.  <u>The ALJ Did Not Make Her Own "Medical Judgments" as to Kaelin's Physical
    Impairments</u>

Chevalier argues on reply that the ALJ improperly substituted her own judgment for

competent medical opinion about Kaelin's physical impairments, including carpel tunnel

syndrome and back pain.  (ECF No. 15 at 6–9).  True, "[t]he ALJ cannot arbitrarily substitute his

own judgment for competent medical opinion." *Schillo*, 31 F.4th at 75.  But, as explained below,

the ALJ's decision does not indicate that she made her own "medical judgments."

As to Kaelin's carpal tunnel syndrome, Chevalier argues that the ALJ substituted her own

judgment for competent medical opinion by saying that Kaelin was "neurologically intact apart

from numbness in his hands and wrists."  (*Id.* at 6).  Chevalier argues that the ALJ must have

substituted her own judgment for competent medical opinion because "the record is replete with

observations from [Kaelin's] treating sources to the contrary."  (*Id.*).  In support, Chevalier cites

Kaelin's lengthy carpal tunnel history, dating to 2018, and revealing that it was severe.  (*See id.*

at 6–7).  And, as Chevalier acknowledges, the ALJ stated that Kaelin's carpal tunnel syndrome

was severe before undergoing carpal tunnel release.  (*Id.* at 6).  But in finding that Kaelin was

"neurologically intact apart from numbness in his hands and wrists" (ECF No. 11 at 24), the ALJ

did not substitute her own judgment for competent medical opinion, *Schillo*, 31 F.4th at 75, or

otherwise "attempt to forge [her] own medical opinions based on raw data or reject diagnoses

provided by medical professionals," *Ramsey v. Comm'r of Soc. Sec.*, 830 F. App'x 37, 39 (2d

Cir. 2020) (Summary Order).  The term "neurologically intact" derives from Dr. Chin's

treatment notes from both before and after Kaelin's carpal tunnel release.  (*See* ECF Nos. 11-2

at 152; 11-3 at 11; 1-5 at 37, 44).  As the Court noted in *Antrip v. Bowen*, 651 F. Supp. 376, 381

(S.D.N.Y. 1987), there is an "often thin line between an ALJ's legitimate consideration of

medical evidence and his improper substitution of his own 'medical judgment.'"  But, as in

*Antrip*, that line has not been crossed here. "The ALJ's observations about the true severity of [claimant's] pain . . . were made in the context of a review of the entire record, including the objective findings and opinions of examining physicians both within and without the Administration." *Id.* Thus, the ALJ did not improperly substitute her own judgment for a competent medial opinion. *Schillo*, 31 F.4th at 75; *see, e.g.*, *Giron*, 2023 WL 6121764, at *13 (holding that ALJ's statements that claimant's "symptoms have been managed with treatment" and "has not generally required pain medication aside from Ibuprofen and Tylenol" did not cross the "thin line" noted by *Antrip*).

Chevalier also argues, on reply, that the ALJ substituted her own judgment for competent medical opinion about Kaelin's back condition. (ECF No. 15 at 7–10). She argues that "throughout the relevant time period, [Kaelin] suffered from low back impairment and pain and received physical therapy, medication, and trigger point injections, all of which only partially relieved his pain" and "[t]here is no medical evidence of record to the contrary." (*Id.* at 8). But this argument fails to explain how the ALJ substituted her own judgment for competent medical opinion. As explained above, the ALJ's finding about Kaelin's back condition was supported by substantial evidence. *See supra* Section IV.A.1. Chevalier further argues that the ALJ substituted her own judgment for competent medical opinion by discounting the opinions, regarding Kaelin's back, from Dr. Puri, Dr. Chin, Dr. Mitamura, and Dr. Jindal. (ECF No. 15 at 8). But, as explained above, the ALJ did not err in weighing the persuasiveness of these opinions. *See supra* Section IV.A.3.

Finally, Chevalier argues that the ALJ "manufactured . . . her own lay opinion" by finding that Kaelin "requires work in which he can sit for 1-2 minutes after 20 minutes of standing" because the ALJ "cited no evidence for this holding." (ECF No. 15 at 9). True, the

ALJ did not explicitly explain why Kaelin required a sit/stand limitation.  (*See* ECF No. 11 at 27).  But, as with the cane limitation, the sit/stand limitation was a greater limitation than those assessed in the opinions the ALJ found persuasive.  The ALJ found persuasive the opinions of Dr. Angelotti and Dr. Gahndi, both of whom opined that Kaelin was limited to light work with certain postural and environmental limitations.  (*See* ECF No. 11 at 90–93, 113–16).  They opined that Kaelin could stand, walk, and sit, with normal breaks, for six hours in an eight-hour workday.  (*Id.* at 90, 113).  Similarly, the ALJ found Dr. Puri's opinion persuasive in limiting Kaelin to light work generally.  (*Id.* at 25–26).  But the ALJ ultimately assessed a greater limitation, finding that Kaelin required a sit/stand limitation, allowing him to sit for 1-2 minutes after 20 minutes of standing.  (*Id.* at 27).  Because the ALJ assessed a greater—or a more restrictive—limitation, the ALJ did not commit reversible error.  *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining to remand for consideration of a treating physician's opinion where the Court "f[ound] no reasonable likelihood that [the ALJ's] consideration of the [treating physician's] report would have changed the ALJ's determination"); *cf. Stephanie G. v. Comm'r of Soc. Sec.*, No 21-cv-301, 2023 WL 3230429, at *3 (W.D.N.Y. May 3, 2023) ("Given the medical opinions in the record—none of which incorporate a sit/stand option—even if the ALJ erroneously relied on his lay judgment to add this more restrictive limitation, [claimant] has not shown harmful error justifying remand.").[28]

---

[28] *See also Symphonie A. v. Kijakazi*, No. 21-cv-75F, 2023 WL 235503, at *7 (W.D.N.Y. Jan. 18, 2023) ("That the ALJ's determination that [claimant] could work a job in which she was allowed to be off task for 5% of the workday is not 'tethered' to any particular medical evidence in the record, in the absence of any evidence in the record suggesting [claimant] would be off task more than 5% of the work day, establishes only that the ALJ's finding is more restrictive than the medical record supports such that even if incorrect, the ALJ's RFC determination is merely harmless error."); *Mulosmanaj v. Comm'r of Soc. Sec.*, No. 14-cv-6122, 2016 WL 11483836, at *6 (S.D.N.Y. June 24, 2016) ("[E]ven if ALJ Rodriguez erred by finding that Mulosmanaj had greater limitations than those indicated by Dr. Elkowitz, the error would be favorable to Mulosmanaj's position and, hence, harmless.  Any such error therefore does not entitle Mulosmanaj to a remand."), *report and recommendation adopted sub nom.*, *Mulosmanaj v. Colvin*, 2016 WL 4775613 (S.D.N.Y. Sept. 14, 2016).

Thus, Chevalier's argument that the ALJ substituted her own judgment for competent medical opinion is meritless.

5. The ALJ Did Not Make Her Own "Medical Judgments" as to Kaelin's Mental Impairments

Chevalier also argues on reply that the ALJ improperly substituted her own judgment for competent medical opinion about Kaelin's mental impairments. (ECF No. 15 at 5). Chevalier explains that Dr. Tsoubris found that Kaelin had marked limitations in interacting with supervisors, co-workers, and the public; in sustaining an ordinary routine and regular attendance at work; and in regulating emotions, controlling behavior, and maintaining wellbeing. (*Id.*). But, Chevalier argues, the ALJ "arbitrarily substitute[d] her own judgment" and found that Kaelin only had moderate social and adaptive limitations. (*Id.*).

This argument is meritless. Although Dr. Tsoubris did find that Kaelin had certain marked limitations,[29] the ALJ appropriately found this opinion only partially persuasive because there was "little support for marked social and adaptive deficits." (ECF No. 11 at 24). As the ALJ explained, while Kaelin had described significant difficulties,[30] Dr. Tsoubris' examination

---

[29] Dr. Tsoubris opined as follows: "Understand, remember, or apply simple directions and instructions, no evidence of limitation. Understand, remember, or apply complex directions and instructions, no evidence of limitation. Use reason and judgment to make work-related decisions, no evidence of limitation. Interact adequately with supervisors, co-workers, and the public marked limitation. Sustain concentration and perform a task at a consistent pace, no evidence of limitation. Sustain an ordinary routine and regular attendance at work, marked limitation. Regulate emotions, control behavior, and maintain well-being, marked limitation. Maintain personal hygiene and appropriate attire, mild limitation. Awareness of normal hazards and taking appropriate precautions, no evidence of limitation." (ECF No. 11-3 at 41).

[30] Under "current functioning," Dr. Tsoubris wrote: "He wakes up two times a night. He has loss of appetite. He has gained 10 lb in three months. Depressive symptoms include dysphoric mood, fatigue, excessive crying, guilt, hopelessness, loss of usual interest, worthlessness, diminished sense of pleasure, social withdrawal, and concentration difficulties. No suicidal or homicidal ideation or intent in the last 30 days. Anxiety-related symptoms: Excessive worry, irritability, avoidance of social settings, fear of being judged, restlessness, easily fatigued, and difficulty concentrating. He has a history of trauma. He has flashbacks, nightmares, avoidance, and intrusive thoughts. He has panic attacks three times a day where he has palpitations, nausea, sweating, trembling, and chest pain. He does not know what triggers them. Manic symptoms: Decreased need for sleep, distractibility, psychomotor agitation, and increased goal-directed behavior." (ECF No. 11-3 at 38–39).

revealed that Kaelin engaged in appropriate social interaction[31] with fair grooming[32] and little evidence of marked deficits in any functional area.[33]  (*Id.*).  Thus, the ALJ appropriately found that, in these respects, Dr. Tsoubris' opinion was not consistent with the record and unsupported by his objective findings.  (*Id.*).  As a result, the ALJ's finding that Kaelin was "affected by no more than moderate mental restrictions overall" (*id.*), was substantially supported by Dr. Tsoubris' objective findings and other evidence in the record.

The ALJ's finding is bolstered by Kaelin's mental health treatment records, which the ALJ cited and reviewed earlier in her decision.  (*See id.* at 23–24).  Kaelin suffered from several mental impairments, including bipolar disorder, anxiety disorder, ADHD, and PTSD symptoms related to childhood sexual abuse.  (*See, e.g.*, ECF No. 11-2 at 22, 26).  But, as the ALJ noted, despite these issues, Kaelin was cognitively intact with normal communicative abilities.  (ECF No. 11 at 23).  And his social and adaptive abilities were no more than moderately limited.  (*Id.*).  In February 2019, Kaelin appeared for a mental status assessment.  (*See id.* at 309–32).  At that time, his mental status findings were unremarkable.  He presented as alert and clean with appropriate attire.  (*Id.* at 309).  He presented with a depressed mood but cooperative with appropriate behavior.  (*Id.*).  Speech and cognition were intact apart from fair ability to concentrate and fair immediate, recent, and remote memory.  (*Id.* at 310–11).  In March 2019, Kaelin exhibited good attention/concentration with grossly intact cognition and average intelligence.  (*Id.* at 326).  During subsequent exams, Kaelin's mental status function generally

---

[31] Dr. Tsoubris noted: "The claimant was cooperative.  Social skills were adequate."  (ECF No. 11-3 at 39).  Further, under "speech," Dr. Tsoubris observed: "Fluent.  Quality of voice was clear.  Expressive language was adequate.  Receptive language was adequate."  (*Id.*).

[32] Under "appearance," Dr. Tsoubris noted: "General appearance was older.  Mode of dress was casual.  Personal hygiene and grooming were fairly groomed.  Posture was rigid.  Motor behavior was normal.  Eye contact was appropriate."  (ECF No. 11-3 at 39).  Under "mode of living," Dr. Tsoubris noted: "He can dress, bathe, and groom himself."  (*Id.* at 40).

[33] *See* ECF No. 11-3 at 38–41.

remained intact.[34]  More recent treatment notes revealed ongoing complaints of anxiety, depression, bipolar disorder, and ADHD.  (*See, e.g.*, ECF No. 11-5 at 75–76, 91–93, 106–08). But despite Kaelin's persistent signs and symptoms, his mental status function was generally unremarkable apart from anxious and depressed moods.[35]  For example, there was no evidence of disordered thought processes or other cognitive dysfunction.[36]  His communitive abilities remained intact with cooperative and appropriate interactions with examining and treating sources.[37]  For example, in March 2021, Kaelin reported that his mood had been stable and with good sleep and appetite.  (*Id.* at 210).  In May 2021, he reported that "the depression he feels is doing well."  (*Id.* at 191).  In August, September, and October 2021, he reported good mood with no complaints about behavior, but reported some difficulty managing stressors related to his ex-partner.  (*Id.* at 145, 152, 160).  In February 2022, his most recent depressed episode was assessed as mild.  (*Id.* at 93).  Additionally, Kaelin's visits to Dr. Jindal often revealed unremarkable mental status findings.[38]  Thus, the ALJ's finding that Kaelin was "affected by no more than moderate mental restrictions overall" (ECF No. 11 at 23), was substantially supported by Kaelin's mental health treatment records.  Thus, the ALJ did not improperly substitute her own judgment for competent medical opinion about Kaelin's mental impairments.

## B.    The ALJ Appropriately Found That There Were Jobs in Significant Number in the National Economy that Kaelin Could Perform

Chevalier makes a series of sub-arguments that challenge the ALJ's finding that there were jobs in significant number in the national economy that Kaelin could perform (in step five).

---

[34] *See* ECF Nos. 11-1 at 73–75, 81–83, 97–99, 105–07, 113–15, 133–35, 141–43; 11-2 at 7–9, 23–25, 31–33, 69–71, 77–79, 85–87, 93–95, 102–04, 110–12, 118–20, 134–36.
[35] *See* ECF No. 11-5 at 76–77, 93, 109, 124, 139, 146, 153, 160, 167, 183–84, 191–92, 196–97, 202–03, 210–11, 222, 227, 234–35, 254–55.
[36] *See id.*
[37] *See id.*
[38] *See* ECF Nos. 11-3 at 44, 113, 117, 121, 125, 129, 133, 137; 11-4 at 3, 7, 13, 22, 26, 30, 32, 35, 42, 44, 50, 52, 58, 62, 64.

(ECF Nos. 13 at 27–29; 15 at 9–10).  First, Chevalier argues that Kaelin was unable to perform any of the jobs identified by the vocational expert.  (ECF No. 13 at 27–29).  Second, Chevalier argues that the ALJ misapplied the Medical-Vocational Guidelines.  (*Id.* at 27–28).  Third, Chevalier argues, on reply, that the ALJ failed to adequately consider absenteeism and time off-task.  (ECF No. 15 at 10).  The Court addresses each of these arguments in turn.

1. The ALJ Appropriately Found that Kaelin Could Perform the Jobs Identified by the Vocational Expert

Chevalier argues that Kaelin was unable to perform any of the jobs identified by the vocational expert because they require "substantial," "constant," or "a great deal" of hand movement.  (ECF No. 13 at 27–29).  This argument fails.

As noted above, the claimant bears the burden at steps one through four.  *See Schillo*, 31 F.4th at 70.  Only at step five does the burden shift to the Commissioner.  *See Schillo*, 31 F.4th at 70.  And that burden shift is limited.  *Id.*  At step five, "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam) (citing 20 C.F.R. § 404.1560(c)(2)); *see also Schillo*, 31 F.4th at 70.[39]

Here, at step four, the ALJ found that Kaelin had the RFC to perform light work with certain limitations.  (ECF No. 11 at 22–27).  One of those limitations was that Kaelin was "limited to frequent fine and gross hand manipulations bilaterally."  (*Id.* at 22).  And as explained above, the ALJ's RFC finding was supported by substantial evidence.  *See supra*

---

[39] "In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.  We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work."  20 C.F.R. § 404.1560(c)(2).

Section IV.A.1. At step five, the Commissioner did not need to provide more evidence of Kaelin's RFC. *Poupore*, 566 F.3d at 306. Rather, the Commissioner only needed to show that there was work in the national economy that Kaelin could do. *Id.* In doing so, the ALJ relied on a vocational expert, who identified three jobs in the national economy that a hypothetical person of Kaelin's age, education, work experience, and RFC could perform. (*See* ECF No. 11 at 28, 75–76). The ALJ's posed hypothetical included Kaelin's limitation to "frequent fine and gross hand manipulations bilaterally." (*Id.* at 75). The three jobs the vocational expert identified were price marker,[40] routing clerk,[41] and mail sorter.[42] (*Id.*). As the vocational expert testified, and as noted by the ALJ, each of these three jobs is of the light exertional level and require frequent fingering and handling.[43] Because Kaelin was limited to light work, with certain limitations, including frequent fine and gross hand manipulations bilaterally, and these three jobs met the criteria, the Commissioner met his burden of demonstrating that there were jobs in the national economy that Kaelin could perform. Thus, Chevalier's argument that Kaelin was unable to perform these jobs is meritless.

---

[40] *See Marker*, DICTIONARY OF OCCUPATIONAL TITLES, Code 209.587-034, 1991 WL 671802 (4th ed. 1991) ("Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine . . . .").

[41] *See Routing Clerk*, DICTIONARY OF OCCUPATIONAL TITLES, Code 222.687-022, 1991 WL 672133 (4th ed. 1991) ("Sorts bundles, boxes, or lots of articles for delivery: Reads delivery or route numbers marked on articles or delivery slips, or determines locations of addresses indicated on delivery slips, using charts. Places or stacks articles in bins designated according to route, driver, or type.").

[42] *See Mail Clerk*, DICTIONARY OF OCCUPATIONAL TITLES, Code 209.687-026, 1991 WL 671813 (4th ed. 1991) ("Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter. May fold letters or circulars and insert in envelopes . . . . May distribute and collect mail. May weigh mail to determine that postage is correct. May keep record of registered mail. May address mail, using addressing machine . . . .").

[43] *See Marker*, 1991 WL 671802; *Routing Clerk*, 1991 WL 672133; *Mail Sorter*, 1991 WL 671813.

2.   The ALJ Did Not Misapply the Medical-Vocational Guidelines

Chevalier also argues that the ALJ misapplied the Medical-Vocational Guidelines.[44]

(ECF No. 13 at 27–28).  She argues that Kaelin, who was 49 years old on his alleged onset date,

had "changed age category" from a younger individual to "closely approaching advanced age" at

age 50,[45] while his administrative proceeding was still pending.  (*Id.* at 27).  According to

Chevalier, if Kaelin were limited to sedentary work and his past relevant work was unskilled, he

would have been disabled under the Medical-Vocational guidelines, under 20 C.F.R. Part 404,

Subpart P, Appendix 2 § 201.12.[46] (*Id.*).  Also, according to Chevalier, Kaelin would have been

disabled under 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.14,[47] if he were "skilled with

skills [that were] not transferrable."  (*Id.*).  Further, according to Chevalier, "if he were limited to

light work, he would be eligible to be considered disabled, "if his past relevant work "met the

unskilled/skilled requirements of § 202.00(c)."[48]  (*Id.*).  Because Kaelin "met all of the

---

[44] The medical vocational guidelines, also known as the "grids," are a series of tables turned into separate rules that classify a claimant as disabled or not disabled, based on the claimant's RFC, age, education, and work experience.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2; *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) ("The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.") (alteration and internal quotation marks omitted).

[45] *See* 20 C.F.R. § 416.963(d) ("If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.").

[46] Under 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.12, "a person who is closely approaching advanced age with a high school education and unskilled previous work experience should be found disabled if he or she can perform only sedentary work."  *Miller v. Astrue*, No. 11-cv-4103, 2013 WL 789232, at *14 (E.D.N.Y. Mar. 1, 2023).

[47] 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.14 "directs a finding of disabled for persons closely approaching advanced age where high school graduate or more—does not provide for direct entry into skilled work, and skilled or semiskilled—skills not transferable."  *Mirante v. Saul*, No. 20-cv-4051, 2021 WL 4311756, at *7 (S.D.N.Y. Sept. 1, 2021) (alterations and internal quotation marks omitted), *report and recommendation adopted*, 2021 WL 4311341 (S.D.N.Y. Sept. 21, 2021).

[48] 20 C.F.R. Part 404, Subpart P, Appendix 2 § 202.00(c) provides, "for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled."  *See also Taveras v. Comm'r of Soc. Sec.*, No. 22-cv-10825, 2024 WL 687912, at *13 (S.D.N.Y. Feb. 17, 2024).

31

requirements of [these] relevant sections of the Grid at age 50, at a minimum," Chevalier argues

that Kaelin was disabled as of his fiftieth birthday.  (*Id.*).

Chevalier's arguments fail for at least two reasons.  First, the ALJ appropriately relied on

the testimony of a vocational expert, rather than solely applying the Medical-Vocational

Guidelines.  As the Second Circuit has explained, "[a]n ALJ may make this determination *either*

*by applying the Medical Vocational Guidelines or by adducing testimony of a vocational*

*expert*."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (emphasis added).  Application of

the Medical Vocational Guidelines is generally limited to "the ordinary case."  *Rosa v. Callahan*,

168 F.3d 72, 78 (2d Cir. 1999) ("In the ordinary case, the Commissioner meets his burden at the

fifth step by resorting to the applicable medical vocational guidelines (the grids).") (internal

quotation marks omitted).  In fact, exclusive reliance on the Medical Vocational Guidelines "is

inappropriate where the guidelines fail to describe the full extent of a claimant's physical

limitations."  *Id.*  "In particular, sole reliance on the grids may be precluded where the claimant's

exertional impairments are compounded by significant nonexertional impairments that limit the

range of sedentary work that the claimant can perform."  *Id.* (alterations and internal quotation

marks omitted).  In such circumstances, "the Commissioner must introduce the testimony of a

vocational expert (or other similar evidence) that jobs exist in the economy which claimant can

obtain and perform."  *Id.* (internal quotation marks omitted).

This case was not "the ordinary case."  *Id.*  The ALJ's RFC finding delineated several

nonexertional impairments (*see* ECF No. 11 at 22) that warranted reliance on a vocational expert.

*Rosa*, 166 F.3d at 78.  For example, Kaelin's limitations as to balancing; fingering; exposure to

fumes, odors, dusts, and gases; understanding, remembering, and carrying out routine repetitive

tasks with occasional contact with supervisors, coworkers, and the general public; and low-stress

environment (ECF No. 11 at 22), were nonexertional limitations.  *See Rosa*, 166 F.3d at 78 n.2

("A nonexertional limitation is one imposed by the claimant's impairments that affect her ability

to meet the requirements of jobs other than strength demands, and includes manipulative

impairments and pain."); 20 C.F.R. § 404.1569a(c) (setting forth examples of nonexertional

limitations, which include, "difficulty understanding or remembering detailed instructions,"

"difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate

dust or fumes," and "difficulty performing the manipulative or postural functions of some

work"); SSR 96-9p, 1996 WL 374185, at *5 (S.S.A. July 2, 1996) ("[A] nonexertional limitation

is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing,

speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling,

fingering, and feeling. Environmental restrictions are also considered to be nonexertional.").  As

such, it was appropriate for the ALJ to rely on the testimony of a vocational expert in lieu of sole

reliance on the Medical Vocational Guidelines.  *Rosa*, 166 F.3d at 78.  Thus, Chevalier's

argument that the ALJ misapplied the Medical Vocational Guidelines is meritless.

Second, even if the ALJ needed to rely on the Medical Vocational Guidelines in lieu of a

vocational expert, Chevalier's argument that the Medical Vocational Guidelines would have

mandated a finding of disability is meritless.  As the Commissioner argues, Chevalier's argument

is based on misapplication of the Medical Vocational Guidelines.  (ECF No. 14 at 26).

To start, Chevalier argues that if Kaelin were limited to sedentary work and his past

relevant work was unskilled, he would have been disabled under the Medical-Vocational

guidelines, under § 201.12.  (ECF No. 13 at 27).  She also argues he would have been disabled

under § 201.14, if he were "skilled with skills [that were] not transferrable."  (*Id.*).  But

§§ 201.12 and 201.14 only apply to individuals who are limited to sedentary work.  *See* 20

C.F.R. Part 404, Subpart P, Appendix 2 §§ 201.12, 201.14. Here, the ALJ found that Kaelin was limited to light work. (*See* ECF No. 11 at 22). And as explained above, that finding was supported by substantial evidence. *See supra* Section IV.A.1. Thus, §§ 201.12 and 201.14 were inapplicable. *Cf. Rodriguez v. Comm'r of Soc. Sec.*, No. 15-cv-6596, 2016 WL5660410, at *9 (S.D.N.Y. Sept. 30, 2016) ("[B]ecause Section 201.14 applies to individuals who can only perform sedentary work—rather than light work—[claimant's] argument that the ALJ would have found him disabled had the ALJ used the older age category holds true only if the ALJ erred in finding [claimant] capable of 'light work.'"); *Babcock v. Berryhill*, No. 17-cv-580, 2018 WL 4347795, at *13 (N.D.N.Y. Sept. 12, 2018) ("Since the ALJ's RFC determination that the claimant could perform light work (during the relevant time period, May 15, 2010 to December 31, 2013) is supported by substantial evidence, the Court likewise concludes that the ALJ's finding that the claimant was not disabled—based on the testimony of the vocational expert that the claimant was capable of performing other work—is supported by substantial evidence."); *Corinna H. v. Comm'r of Soc. Sec.*, No. 18-cv-1256, 2020 WL 706844, at *9 (N.D.N.Y. Feb. 12, 2020) (same).

Finally, Chevalier argues that if Kaelin "were limited to light work, he would be eligible to be considered disabled," if his past relevant work "met the unskilled/skilled requirements of § 202.00(c)." (ECF No. 13 at 27). But this argument is also meritless. As the Commissioner explains, 20 C.F.R. Part 404, Subpart P, Appendix 2 §§ 202.13, 202.14, and 202.15 "make clear that an individual closely approaching advanced age that has at least a high school education and is limited to light work is not disabled, regardless of whether he had had past relevant work and whether the past relevant work was skilled or unskilled." (ECF No. 14 at 26). Thus, Kaelin would not have been found disabled under § 202.00(c).

3.   The Hypothetical Posed by the ALJ to the Vocational Expert Was Adequate

Lastly, Chevalier argues on reply that the ALJ failed to adequately consider absenteeism and time off-task.  (ECF No. 15 at 10).  She argues, "[i]f due to unscheduled breaks, [Kaelin] were to be off-task for more than 15% of the workday, he could not perform any work available in the national economy" and "[i]f he were absent from work 3 days per month, there would be no work available for him in the national economy."  (*Id.*).

The vocational expert did testify that unscheduled absences of three days per month or unscheduled breaks causing more than 15% of the workday to be off-task would preclude all work.  (*See* ECF No. 11 at 77).  In some cases, this Court has found that an ALJ's failure to reconcile absenteeism or time off-task could warrant remand.  For example, in *Santos v. Kijakazi*, No. 21-cv-1682, 2022 WL 4354372, at *8 (S.D.N.Y. Sept. 20, 2022), the Court vacated and remanded where the ALJ had failed to reconcile the vocational expert's testimony about absenteeism with the opinions of three medical sources that the claimant had moderate limitations as to the ability to maintain a regular schedule.  Similarly, in *Bellini v. O'Malley*, No. 22-cv-9639, 2024 WL 1328383, at *7–8 (S.D.N.Y. Mar. 28, 2024), the Court vacated and remanded where five medical sources had concluded that the claimant suffered from at least a moderate limitation as to absenteeism.  But here, the ALJ did not commit error by failing to address absenteeism and time off-task.  Chevalier does not identify any evidence revealing that Kaelin had any limitations as to absenteeism or time off-task.  (*See* ECF No. 15 at 10).  And, based on the Court's review of the record, only one doctor, Dr. Tsoubris, opined that Kaelin had a "marked limitation" in sustaining an "ordinary routine and regular attendance at work."  (ECF No. 11-3 at 41).  But, as explained above, the ALJ found Dr. Tsoubris' opinion unpersuasive because it was inconsistent with the record and unsupported by his own objective findings.  *See*

*supra* Section IV.A.5.  Thus, the ALJ did not err by failing to address time off-task or

absenteeism.  *Cf. Collado v. Kijakazi*, No. 20-cv-11112, 2022 WL 1960612, at *10 (S.D.N.Y.

June 6, 2022) (finding that the ALJ did not commit error where there was substantial evidence

that claimant could maintain regular attendance and only one doctor opined that claimant would

be absent more than once a month, an opinion that was unsupported by medical facts and by the

other doctor's assessments).

## CONCLUSION

The Court extends its condolences to Mr. Kaelin's family for their loss.  The Court is

sympathetic to the late Mr. Kaelin's medical conditions and the difficulties attendant to them.

But a claimant is not entitled to benefits under the Social Security Act solely because of medical

impairments.  Instead, a claimant must establish that, during the relevant period between his

alleged onset date and date of last insured, his medical impairments precluded him from

performing both his past relevant work and any other work that is available in significant

numbers in the national economy.  Because the ALJ's finding that Mr. Kaelin was not limited to

that degree was free of legal error and supported by substantial evidence, I respectfully

recommend that Chevalier's motion for judgment on the pleadings be **DENIED** and the

Commissioner's cross-motion for judgment on the pleadings be **GRANTED**.

Finally, the Clerk of Court is respectfully directed to amend the official caption to

conform to the caption reflected on the first page of this Report and Recommendation.

**SO ORDERED.**

DATED:    White Plains, New York
          August 8, 2024


_____
VICTORIA REZNIK
United States Magistrate Judge

**NOTICE**

**Pursuant to 28 U.S.C. § 636(b)(l) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from service of this Report and Recommendation to file written objections. Fed. R. Civ. P. 6(a). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any responses to such objections, shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Nelson Stephen Román, United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.**

**FAILURE TO TIMELY FILE OBJECTIONS TO THIS REPORT AND RECOMMENDATION WILL PRECLUDE LATER APPELLATE REVIEW OF ANY ORDER OF JUDGMENT TO BE ENTERED.** ***See Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008).**

Any request for an extension of time for filing objections or responses to objections must be directed to Judge Román, and not to the undersigned.